[No. 2147.]

BRITTON TURNER *v.* THE STATE.

1. CONTINUANCE — NEW TRIAL.— See the statement of the case for an application for a continuance which, being in all essentials sufficient as to diligence, and setting forth absent testimony material and probably true when considered in connection with the evidence adduced on the trial, demanded of the trial court the award of a new trial because of the refusal of the continuance. Note the animadversions of this court upon the conduct of the sheriff in withholding from the court below information important to its action in this case.

2. MURDER — FACT CASE.— See the statement of the case for evidence held insufficient to support a conviction for murder of the second degree.

APPEAL from the District Court of Houston. Tried below before the Hon. F. A. Williams.

The indictment in this case charged the appellant with the murder of G. W. Montzingo, in Houston county, Texas, on the 27th day of October, 1883, by stabbing him with a knife. This is the second appeal prosecuted in this case, the penalty assessed on the last trial being confinement in the penitentiary for the term of five years. The report of the former appeal, to be found on page 433 of the sixteenth volume of these reports, contains but a partial *resumé* of the facts proved on that trial, independent of its reference back to the report of the companion case of *John Turner* v. *The State*, convicted for the same offense. The disposition of this appeal turning, in part, upon the evidence, a more complete statement of the case is found necessary.

Mrs. Robinson was the first witness sworn for the State. She testified that, at the time of the homicide, she was the wife of the

deceased, G. W. Montzingo. Witness was present on the 29th day of October, 1883, and saw the fatal difficulty between the deceased on one side and the defendant, John Turner and one Mr. Stanley on the other. The difficulty occurred in the witness's yard, in Nevill's prairie, about four miles from the town of Lovelady, in Houston county, Texas. · The defendant came to the deceased's house about 12 o'clock on the day of the difficulty, and asked the deceased to go with him to Lovelady. Deceased replied that he had already arranged to go in a buggy with Doctor Glover. Thereupon the defendant left. Deceased got home from Lovelady that evening about sundown, coming in a wagon with Mr. McManus. He had but recently arrived when the defendant, his brother John and one Stanley rode up to the gate. Witness did not hear them call to Montzingo, nor did she hear Montzingo invite them to dismount and come in. The parties named, however, dismounted, secured their horses to the fence, passed into the yard and up to the gallery where the witness, defendant and their children were then standing. They came up together, walking abreast, and each rested one foot on the gallery step. John Turner then laid his hand on deceased's shoulder and said to him: "I understand you have been talking about my father." The defendant then in a violent manner said: "I can whip any G—d d—d man that ever lived!" The deceased, in reply to John Turner's remarks, said: "I have not been talking about your father; I am a friend of his." John Turner then pointed to Stanley and said: "There's your man!" The witness then ordered the defendant, his brother John and Stanley off the premises. She ordered them to leave two or three different times, telling them that they had come to provoke a difficulty. They did not leave, but maintained their separate positions. The deceased then ordered the three parties out of the yard as often as three times, saying: "You have come here for a difficulty. I don't want a difficulty, and you must get out of my yard." The deceased then picked up an ax handle which was lying near, stood a while with it in his hands with one end touching the floor of the gallery, and presently struck Stanley with it twice, and struck at him a third time, missing him, the blow being warded off by some one of the party. Defendant, John Turner and Stanley then closed together upon the deceased and killed him. The witness could not tell who of the party used the most violence in the difficulty. Witness did not see either one of the three cut the deceased, and could not say who inflicted the stab. She could not say that either one of the three used more violence than the others.

The three parties, viz., defendant, Stanley and John Turner,

backed in a body towards the gate when deceased commenced to strike Stanley with the ax handle, and when they reached a point within one or two feet of the gate, witness heard the deceased say that he was cut. Deceased then turned, walked towards the house as far as the gallery steps, where he fell, and died within a very few minutes. The witness received a cut on her arm during the fight. After deceased had inflicted the blows with the ax handle, and had become separated from the other parties, witness undertook to push Stanley out of the yard, when he struck her, inflicting a cut upon her arm. She then, for the first time during the difficulty, saw a knife, and it was in Stanley's hands. The witness was too much troubled and distressed after the killing to examine the wound of the deceased, and could not otherwise describe it than that it was a knife cut in the left breast. The yard gate stood some five or six steps distant from the gallery steps. Blood was scattered over the entire space between the gallery and the gate, and witness saw blood on the left gate post. She also saw blood on the yard palings, on the inside. The difficulty lasted but a few minutes. Neither defendant, John Turner nor Stanley struck the deceased after the deceased turned towards the house from the gate and said that he was cut. The three parties left the deceased's house as soon as the fight was over. Stanley ran off on foot, his horse having broken his tie-string and gone off while the fight was in progress. Defendant and his brother John rode off at a rapid pace. John Turner and Stanley went off in the direction of where they lived. Witness could not say which way defendant went. The deceased was well and in good health up to the time that the difficulty occurred. He was cut in the left breast in that difficulty by either defendant, Stanley or John Turner, and died within a few minutes after the wound was inflicted. Mr. Bob Stevens was the first person to reach the house of the deceased after the difficulty. Deceased died just about the time that Stevens arrived. Deceased did not speak after he fell at the steps. Defendant and John Turner were brothers, and, at the time of the difficulty, lived at their father's house, between a quarter and a half mile from deceased's house. Stanley also lived at old man Turner's, but as a tenant. About the time that the conflict ended, witness saw Buck Shaw on his horse at the gate, watching the fight. He rode off with the Turners when they left. This all occurred in Houston county, Texas, on the 29th day of October, 1883.

Cross-examined, the witness stated that the deceased was not under the influence of liquor at the time of his encounter with the

Turners and Stanley.  He brought home with him a small flask of whisky, from which it appeared that perhaps as much as one drink had been taken.  Deceased did not ask the Turners and Stanley to dismount and come into the house, or if he did the witness did not hear him.  If the defendant left to summon medical attendance for deceased, the witness did not know it.  Witness's son Henry went for the doctor.  Witness saw the defendant about the place after the fracas, but he staid but a very few moments.  She saw Doctor Glover and Mr. Worthington about the same time.  Witness did not see an ax in the hands of any of the parties during the fight, and, as a matter of fact, she was too much excited to notice if either of them had any weapon of any description.  Witness did not notice the defendant particularly, and could not say what actual part he took in the difficulty.  So far as the witness could judge, no one of the parties did more than the others.  The three closed around the deceased, and had him completely surrounded.  The families of the deceased and the defendant had been on good terms previous to the difficulty, but their relations were somewhat strained about the time of the difficulty.  So far as the witness knew, the rupture did not include the deceased, and if he had conceived any unfriendly feelings towards the Turners, the witness did not know it.  Until recently before the difficulty, witness and the Turners visited on good terms.  Their visits had of late grown less frequent.  When the deceased ordered the parties out of his yard, they refused to go.  Deceased then pulled off his coat, stepped off the gallery, took up an ax handle and began striking Stanley with it.  He was at the end of the gallery when he struck the first blow.  The Turners and Stanley fell back together towards the gate, when deceased struck that first blow.  Witness saw no weapons used by any of the parties during the struggle between them and the deceased.  Witness's hearing was defective, and she failed to comprehend all that was said by the several parties during the fight.  Witness was very much excited by the transaction, and suffered so much from its immediate results that she could not recall all of the incidents of the struggle, nor could she remember all that she has heretofore testified in regard to this case.

On re-direct examination, the witness said that she saw blood on the left hand gate post, going into the yard.  The witness did not see the defendant do or attempt to do anything to prevent the fight.  The Turners and Stanley all acted as though they had been drinking, but they were not drunk.  Doctor Glover lived between a quarter and a half mile distant from the deceased's house.  De-

ceased was dead when the doctor arrived. Witness had married Mr. Robinson since the death of the deceased. Witness saw no weapons lying around the yard after the fight, except an ax which had blood on both the blade and the handle. That ax lay inside the yard, near the gate, and across the path which led from the gallery to the gate. The witness left the ax at the wood pile near the gate, and saw it near the same place on the path, with blood on it, after the difficulty.

Henry Montzingo was the next witness for the State. He testified that he was a son of the deceased. He was present and saw the difficulty in which his father was killed. It occurred on his father's place in Houston county, Texas, on October 26, or 27, 1883. Deceased returned home from Lovelady about sundown on the evening of that day, and shortly afterwards the defendant, John Turner and Tom Stanley came to the gate and called: "Halloo!" The deceased invited them to dismount and come in. They dismounted and in a body came to the edge of the gallery on which the deceased, his wife and witness were then standing. John Turner stepped up on the steps to the gallery, laid one hand on deceased's hand and said: "Whit, I understand that you have been talking about my father." At this moment defendant took his hat from his head, threw it on the gallery floor, and said: "I can whip any G—d d—d man who talks about my father." Deceased replied: "I have not been talking about your father; I am a friend of his." John Turner stepped from the gallery, pointed to Stanley, and said: "There is your man." Stanley, who was standing a step or two behind John Turner, had said nothing up to this time. Deceased then ordered the three men out of his yard, with the remark: "You have all come here to get up a row, and I don't intend to have any." He ordered them out of the yard as often as three times. They did not go. Deceased thereupon pulled off his coat, caught up an ax handle from the gallery, and began striking Stanley. The Turners and Stanley backed in a body towards the gate. One of the Turners warded off the third blow aimed by deceased at Stanley, and deceased immediately exclaimed that he was cut, and turned and started towards the house. No blows were struck afterwards. When deceased called out that he was cut, witness ran into the house and got the gun. As he stepped into the yard with the gun he was met by John Turner, and the gun was taken from him. At this time witness saw Stanley running off on foot, his horse having broken loose and gone off. The defendant was then gone. John Turner did not attempt to use the gun after he got it from the wit-

ness. Deceased fell at his gallery steps, and called witness several times. John Turner presently mounted his horse and left, going in the direction previously taken by Stanley. Witness went immediately for Doctor Glover, who lived about a half mile distant. Defendant was at Doctor Glover's when the witness arrived there. Doctor Glover, defendant, witness and Mr. Worthington returned to the deceased's house immediately, and found the deceased dead. Defendant remained a very short time at the house, and then went off in the direction taken by John Turner and Stanley. Doctor Glover made some very sharp remarks to the defendant while at the body, and defendant replied that he had nothing to do with the killing. Glover cursed defendant, and told him that he did. The deceased was cut twice, once in the left breast in the region of the heart, and once just below the right shoulder blade. Both wounds penetrated the cavity.

Cross-examined, the witness said that he did not see the ax used by any one, and did not think it could have been used without his seeing it. Witness did not see any attempt on the part of the defendant to injure the deceased. Witness knew of no unfriendly feelings between the Turners and the deceased at the time of the killing. The parties may have backed as far as the gateway during the difficulty, but did not get outside of the yard. They got near or to the gate, because witness, after the killing, saw blood on the left gate post, and on the fence palings on the inside. Witness thought, but was not certain, that there was a little blood on the outside of the yard, on the ground, or on a plow beam which lay just outside of the yard. When witness returned with the doctor, he and those with him passed in at the gate and to the house, over the path leading from the gate to the house. If there was an ax lying on that path, the witness did not see it. Stanley pushed the deceased from him just about the time the deceased called out that he was cut. Deceased was not further molested by the parties. Deceased brought some whisky home with him on that evening, and the witness thought he had been drinking some, but was not drunk. Deceased struck Stanley the first blow from the gallery, and the Turners and Stanley began backing towards the gate. The last blow was struck at a point very near the gate.

Re-direct, the witness testified that he did not see either of the Turners or Stanley make any effort to prevent or to stop the difficulty. The transaction covered but few moments from first to last, and witness remembered nothing about it which he has not related. The parties were all very close together throughout the difficulty.

The ax might have been taken up and used while the witness was in the house after the gun. Witness did not know whether the defendant or Stanley passed out of the gate first after the cutting. John Turner was still there when witness returned with the gun.

Bob Stevens testified, for the State, that a few minutes before the stabbing of the deceased, from a point where he could not see them, he heard loud talking by several parties passing on horseback, and recognized the voice of John Turner, but no others at that time. He heard John Turner say: "Let's go on down to the d—d old son-of-a-b—h's house." Witness could hear the hoof-beats of the horses of the several parties, all coming from the same direction, and going in the direction of the house of the deceased. Within the next fifteen minutes witness heard loud cursing and swearing at deceased's house, some two hundred or two hundred and fifty yards off, and recognized the voice of the deceased. Shortly afterwards witness saw Buck Shaw going in the direction of the house of the deceased, and, after a short time, Stanley on foot and running, and John Turner on horseback, in a fast trot, passed the witness's house. Just before the witness heard the cursing by John Turner on the road, he heard the reports of fire-arms in the direction from which John Turner and the other parties on horseback came. About the time that John Turner and Stanley passed witness's house on their return from the house of the deceased, witness heard a voice, which he recognized as that of the deceased, calling: "Henry, oh Henry." That call was repeated several times, growing fainter and weaker with each repetition. Witness went immediately, and as fast as he could, to the deceased's house, and when he got there he found blood all over the yard, from the gate to the steps. Deceased lay partly on the gallery and partly on the ground, wounded mortally in two places. He did not speak, but gasped once or twice after the witness reached him. One cut, about two inches long, penetrated the left breast, the other, about five inches long, entered the body under the right shoulder blade and looked like it extended to the hollow. This last wound was curved or semi-circular in shape, the upper extreme being nearest the spine. Witness saw no weapons when he first arrived at the house. Doctor Glover, defendant and Mr. Worthington reached the house shortly after the witness did. Defendant remained but a few minutes and left, going in the direction previously traveled by John Turner and Stanley. Glover cursed defendant, and defendant replied that he had nothing to do with the killing. James Shaw came up to the house a few minutes after Doctor Glover arrived, but in a few minutes he rode off.

Doctor Glover examined the wounds on the body, and remarked that the deceased was cut to the heart. While at the house and near the gate in the yard, the witness saw an ax in the hands of Doctor Glover. He noticed a drop of blood on the handle of the ax.

Cross-examined, the witness said that he saw blood in the trail from the gate to the gallery. He saw Glover put the ax across the walk, but did not see where he got it from. He was standing in the walk with the ax in his hand, examining it, when the witness first saw the ax. John Turner, Stanley and Buck Shaw passed witness's house together, going towards Turner's house, shortly after the witness heard the cursing at the house of the deceased.

James Worthington testified, for the State, substantially as did previous witnesses as to the blood found on the premises of the deceased, and the character of the wounds on the body of the deceased. He saw an ax in the hands of Doctor Glover while at the house, just after the killing, and noticed a little blood on it. The witness was one of the jury at the inquest over the body held by John S. Moore, justice of the peace. He saw the doctor introduce a probe to the depth of at least six inches in the wound under the right shoulder blade. The cut was diagonally across the ribs, and appeared to be a straight cut the full length. Witness did not see the wound in the left breast probed. Witness saw an ax on that night, standing against the gallery, with blood on both the handle and the blade. Defendant reached Glover's house about the same time that the deceased's son Henry reached there. The witness did not hear him say what he came for. He went back to deceased's house with Glover, witness and Henry. When he started off, witness called to him, and told him that if, as he claimed, he had nothing to do with the killing, he ought to stay at the deceased's house and not go off. He said nothing, but went on. Deceased was dead when witness and Glover arrived.

Cross-examined, the witness said that the only blood he saw outside of the yard was taken there from the yard by some one who walked over the bloody spots in the yard. The blood on the gate post seemed to have gushed from some body. There was a little blood on the outside of the paling.

A. T. McManus testified, for the State, that the deceased rode in his wagon with him from Lovelady on the day that he was killed. As witness and deceased started from Lovelady, deceased told witness that he had seen his saddle on Stanley's horse; that he had often needed the saddle and was going to take it. He went off, got the saddle, brought it back with him and put it in the wagon, and

he and witness, with the wagon, started home. They had not gone a great distance when they were overtaken by Stanley, who cursed and abused deceased for taking the saddle without saying anything to him, and letting him know that he was going to take it. He then proposed to whip deceased if deceased would get out of the wagon. Deceased replied: "Stanley, you are drunk now, and I don't want to have any trouble with you; you go away and let me alone." Finally the deceased agreed to let Stanley have the saddle to ride home. It was dropped out of the wagon and Stanley said: "By G—d, I won't have it at all if you can't give it to me right!" The saddle was then taken up by someone in the crowd and put back in the wagon, and the wagon, with witness and deceased in it, was driven on towards home. Witness, deceased and Stanley traveled the same road together for a distance of about three miles to the point where the road forked, the fork leading to old man Turner's house. Witness did not not see the defendant or John Turner on the road. Deceased had a flask of whisky, took one drink on the road, but was in no degree under the influence of liquor while in company with the witness. Deceased got out of the wagon at his house. Witness then noticed Mrs. Montzingo at the wood-pile, near the gate, chopping wood. This was late in the evening.

Cross-examined, the witness said that he saw the defendant and John Turner in the town of Lovelady on that day. They did nothing worthy of notice that the witness saw. Witness did not know that they were drinking. Stanley left the main road at the forks and went off towards old man Turner's, where he was living.

L. P. Hemphill testified, for the State, concerning the body, blood, etc., as observed at the inquest, substantially as did the witness Worthington.

John I. Robinson testified, for the State, that he was one of the parties deputized by the justice of the peace to arrest the defendant, his brother John and Stanley. Witness and his party started that night about 10 o'clock to make the arrests. They went first to the house of the defendant's father, but none of the parties wanted were there. Thence they went to the home of the defendant, six or eight miles distant, in a portion of the country very sparsely populated. A path led to the house of defendant, and the house was surrounded by very thick undergrowth. Defendant and his brother John were found there, but Stanley was not with them. The two Turners were arrested without trouble,— they offered no resistance to arrest. No weapons of any kind were found on their persons. John Turner, when accosted, said that he was ready to do

anything required of him, and he and defendant went willingly from that place to custody. Witness saw the Turners and Stanley in Lovelady on the evening of the killing. The three parties were drinking, and Stanley was pretty drunk.

Cross-examined by defense, the witness said that defendant was arrested on a place owned by his father. There was a small house and a small farm on the place. The wound under the shoulder blade was described by this and other witnesses as crosswise the ribs. Witness could not say that that wound penetrated the cavity or severed the ribs.

Doctor Hall testified, for the State, that a knife-cut wound six inches deep, crosswise of a man's ribs, could not be inflicted without severing some of the ribs. It was possible, but not probable, that a six-inch wound crosswise with the ribs, severing the ribs, could be made with an ordinary knife, but witness thought the probability of such a wound with any kind of knife was remote, as the ribs of a man are very tough, and hard to sever. A knife might be inserted into the body parallel with the ribs and make a wound six inches deep. But crosswise the ribs it could not be done without cutting some ribs in two.

C. G. S—— (illegible) testified, for the State, that Stanley surrendered to him four or five miles from deceased's house before process for his arrest issued. The State closed.

John I. Moore testified, for the defense, that he was the justice of the peace who held the inquest over the dead body of Montzingo. Witness examined the body and found a stab in the left breast, over the region of the heart, and a wound under the left shoulder blade, three or four inches long, curving towards the arm pit. There was no wound under the right shoulder blade or to the right of the spine, except a long scratch which was not more than skin-deep. The one under the left shoulder blade was a deep and ghastly wound, as was that on the breast. Witness did not remember that the wounds were probed in his presence.

James Silos, James Jones, J. T. Roberts and John Harrison, the parties who washed and dressed the corpse, corroborated the witness Moore as to the character and location of the wounds on the body of the deceased. They heard no rattling of bones like broken ribs while washing the body. Roberts saw the doctor probe the wound under the shoulder to a depth of six inches. It was not of the same depth throughout its entire length.

G. W. Roan testified, for the defense, that on the morning after the killing he saw blood on the outside of the left hand gate post.

and on the palings three or four feet from the gate, and a little blood on the beam of a plow outside of the gate. He noticed an ax at the wood-pile. J. B. Jones testified substantially to the same facts, except that he did not observe the ax.

The defendant's motion for a continuance, referred to in the first head-note of this report, reads as follows:

"Now comes the defendant, Britton Turner, who says that he cannot go safely to trial in this case at this term of the court for the want of the testimony of Buck Shaw, who resides in the county of Brown, and James Shaw, whose residence is unknown to this defendant, and G. W. Roan, who lives in the county of Limestone. Defendant has used due diligence to procure the evidence of said witness Buck Shaw by first having him subpœnaed as required by law, to wit, on the 15th day of September, 1884, which subpœna is here referred to and made a part hereof. Defendant further shows that said Shaw appeared at a former term of your Honor's court and testified upon the trial of this case. He further shows that said witness then resided in Houston county, and so testified at the spring term of said court, 1884. Said witness was also in attendance at the fall term of your Honor's court, 1884, when this case was called for trial and set for trial on a subsequent day, and when the case was called for trial on the day to which it was set, said witness did not appear, and an attachment was at once called for and obtained, and the officer failed to find him, and the cause was continued at the instance of the defendant for the want of said Shaw's testimony. Defendant would further show that he has made inquiries of every source from which he could expect to hear of the whereabouts of said witness, and was informed that he was in the county of Tarrant, in said State, and this defendant at once, to wit, about the time your Honor's court convened at the spring term, 1885, had an attachment issued to said Tarrant county, but the officer there failed to serve said attachment, because, as he learns and believes, said witness had left said county. Defendant further shows that after all efforts, etc., he could make to ascertain the residence or whereabouts of said Shaw, he failed to learn of his residence until the 7th day of October, 1885, when he was informed that said Shaw was in the said county of Brown, when he at once, on the 8th day of October, 1885, asked for and obtained an attachment from the clerk of the district court of said Houston county for the said Buck Shaw, to the said county of Brown, and the same was forwarded to the sheriff of said county the same day issued. Defendant expects to prove by said witness that he was present and

saw all of the difficulty in which G. W. Montzingo was killed, and that the killing was done by Thomas Stanley alone, and that this defendant did not, by word or act, sign or gesture, or in any other way whatever, aid, directly or indirectly, in the killing of the said Montzingo; and that this affiant knows of no other witness by whom he can prove the same facts. . . . Affiant says that said witnesses are not absent by his procurement or consent; that this application is not made for delay; that defendant has reasonable expectation of procuring the said witness at the next term of your Honor's court; that he has no reasonable expectation of being able to procure his attendance upon this term by a postponement of the trial to a future day of this term."

The motion for new trial raised the questions discussed in the opinion.

*Cooper & Moore* and *A. M. Miller*, for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

HURT, JUDGE. This is the second appeal taken from convictions of murder of the second degree. There are but two questions presented in the record demanding attention. 1st. The action of the court in refusing a new trial growing out of the matter relating to the witness Buck Shaw. 2d. The sufficiency of the evidence to support a conviction for murder.

First. There is no question but that the diligence was sufficient under the circumstances, and that the evidence of the absent witness was of very great importance to defendant and probably true. This being the case, a new trial should have been granted.

It also appears from the record that the witness Buck Shaw had telegraphed to the sheriff that he was on his way to court as a witness for defendant, but this fact was not disclosed either to the court or to defendant or his counsel. This is strange conduct for an officer of the court. If the court had been informed of this fact, a postponement of the case for a few days would have resulted in procuring the evidence of Shaw, and all this matter relating to the continuance been eliminated from the case. What prompted the sheriff to withhold this information, we cannot imagine. We hope he has not made himself a prosecutor in the case. However this may be, we think a new trial should have been granted in order to procure the testimony of Buck Shaw, it being of vital importance to a fair and impartial trial of the case.

Second. That the evidence does not warrant a verdict of guilty of murder in either degree. Appellant was convicted of murder of the second degree on a trial of this case some time in 1884, and appealed to this court in session at Austin, and the judgment was there reversed and the cause remanded because the evidence did not sustain the verdict of the jury.

We have again given the statement of facts a most careful investigation, and are still of the opinion that the evidence wholly fails to support a conviction for murder. The case made upon the last trial is no stronger against defendant than that made on the first. It stands on very much the same criminative facts as when first tried, without the evidence of Shaw, which tended to negative a conspiracy on the part of the parties to kill or inflict serious injury upon deceased. The defect in the State's case is the want of evidence — facts — which reasonably and satisfactorily prove that defendant agreed, consented to, or was a party in any way, to the killing of deceased. That they went to deceased's for the purpose of whipping him, if he should acknowledge that he had spoken with disrespect of old man Turner, may all be true; but there is no evidence clearly showing that defendant intended anything further. Hence we must hold, as we did upon the first appeal, that this verdict and judgment are without that support in evidence which should be had in cases of conviction for crime.

The judgment is reversed and the case remanded.

*Reversed and remanded.*

[Opinion delivered December 16, 1885.]